| | | |
|---|---|---|
| **In re:** | } | |
| | } | |
| **STEVEN JACKSON,** | } | **Case No. 11-42528-JJR-13** |
| **xxx-xx-5391** | } | |
| **Debtor.** | } | |

_____

| | | |
|---|---|---|
| **In re:** | } | |
| | } | |
| **LERIN BROWN,** | } | **Case No.. 11-42825-JJR-13** |
| **xxx-xx-4584** | } | |
| **Debtor.** | } | |

_____

## OPINION AND ORDER

In their respective chapter 13 cases, Steven Jackson ("Jackson") and Lerin Brown ("Brown" and together with Jackson, the "Debtors"), each proposed plans[1] that are now before the Court for confirmation. Plan confirmation in most chapter 13 cases is a simple and uncontroversial affair. However, these cases typify a particular subset of chapter 13 cases that have been filed with disturbing frequency in the Eastern Division of this District. These cases contort the intent of chapter 13 and are nothing more than chapter 7's on the installment plan and benefit no one with the exception of debtors' counsel.

To begin with, it is critical to observe that according to the Debtors' Statements of Current Monthly Income ("CMI Statements"), no presumption of abuse would arise under §

---

[1] Jackson Doc. 30; Brown Doc. 5.

1

707(b)(2) of the Bankruptcy Code[2] if the Debtors had sought relief under chapter 7.[3]  And equally critical, an examination of the Debtors' schedules, statement of financial affairs, and proposed plans leads to the inescapable conclusion that the Debtors are quintessential candidates for chapter 7 relief.  So one must inquire, why did the Debtors seek relief under chapter 13 that postpones discharge pending completion of at least a 3-year plan, when they easily qualified for chapter 7 relief that will provide them with prompt discharges and no long-term commitments?  The answer is an easy one: The Debtors have filed for relief under chapter 13 and not chapter 7 because of their inability or unwillingness to prepay their attorney fees in one lump sum before their  petitions for relief were filed.[4]

---

[2] 11 U.S.C. § 101, *et seq.*, and herein referred to as the "Bankruptcy Code" or "Code." Unless the context indicates otherwise, the symbol "§" is a reference to a section, subsection, paragraph, clause or other subdivision of the Code.

[3] § 707(b)(2) was added to the Code with the adoption of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"), and underscored Congress's intent that debtors whose net income exceeds a calculated threshold should pay all or a portion of their debts through chapter 13, unless they are able to overcome a presumption that granting a discharge under chapter 7 would be an abuse.  However, nothing was changed in the Code limiting access to chapter 7 for otherwise qualified debtors whose net income is below the § 707(b)(2) threshold.  *See*, *Morris v. Quigley (In re Quigley)*, ___ F.3d ___, 2012 WL 718894 *2 (4th Cir. 2012) ("Attempting to address some perceived abuses in the bankruptcy system, as part of [BAPCPA], Congress revised the Bankruptcy Code by requiring debtors with above-median income . . . to file . . . under Chapter 13's reorganization provisions rather than the liquidation provisions of Chapter 7").

[4] In the Northern District of Alabama, attorney fees for chapter 7 cases are typically prepaid before the case is filed, and are usually in an amount significantly less than fees charged for chapter 13 cases.  On the other hand, chapter 13 attorney fees are usually paid in installments through a confirmed plan and are often at least double the customary fee charged for a chapter 7 case.

Jackson's counsel initially sought a fee of $2,500 (Doc. 15), but sensing the Court's aversion to attorney-fee-driven chapter 13 cases, dropped the proposed fee to $1,500 (Doc. 30).  Although a generous reduction, it was beside the point and further demonstrated that even with the reduction, Jackson refused or was unable to pay the fee at commencement of his case and seek the more fitting relief under chapter 7.  For these and similar chapter 13 cases that should

2

*Jackson's Plan*

Over a term of three years, Jackson's plan proposed to pay his attorney fees, filing fees, the trustee's commission, and approximately 18% of scheduled claims of unsecured creditors, assuming those creditors filed proofs of claim.[5]  There were no priority or secured claims to be paid, and according to his schedules, all of Jackson's assets are protected by his allowed exemptions.  The largest debt listed on Jackson's schedules was for a student loan owing to the "Department of Education/Sallie Mae," which would be nondischargeable under § 523(a)(8).[6]

Jackson did not appear at the hearing on plan confirmation, but he was represented by counsel.  At the hearing the Court confronted counsel with the accusation that an objective analysis of the schedules, statement of financial affairs, CMI Statement, and proposed plan demonstrated that the primary motivation behind the case being filed under chapter 13, and not chapter 7, was to finance payment of attorney fees over time through plan payments.  Although

---

have been filed under chapter 7, and assuming a legitimate inability to prepay fees, the Court would encourage counsel to consider pro bono representation or referral to legal aid.

[5] Jackson's Schedule F listed 21 unsecured creditors, whose claims total $14,902.  Five of those creditors are listed as "notice only" without any amounts shown as owing for their claims.  As expected, few creditors bothered to file claims.  Before the claims bar date, only three creditors filed claims in amounts, respectively, of $1,073.47, $200.00, and $451.83.  One scheduled creditor filed a tardy claim after the expiration of the bar date.  As further discussed *infra*, it is both conspicuous and troubling that none of the creditors filing timely claims were listed in Jackson's schedules.  Regardless, if the plan is confirmed, counsel's administrative claim for her fees will be the largest allowed claim in the case.

[6] The claim of the Department of Education/Sallie Mae was scheduled for $4,001.00, and mislabeled as a "credit card debt."  Sallie Mae did not file a claim and neither did Jackson on its behalf.  Education loans may be discharged only if a debtor can show excepting them from discharge will impose an undue burden on the debtor and his dependents. § 523(a)(8).  A review of Jackson's schedules in this case, especially Schedules I and J, disclosed that there is virtually no possibility that such an undue burden exists.

3

counsel never explicitly conceded, she offered no proof to the contrary and did not ask for the hearing to be continued, which is routinely allowed, to give her client an opportunity to rebut the accuracy of what the Court had gleaned from the schedules, plan and related bankruptcy documents. Thus, based on the only evidence available, the Court must presume that its conclusion regarding why Jackson, with counsel's assistance and advice, filed for bankruptcy relief under chapter 13 was accurate: He was either unable or unwilling, or perhaps both, to pay attorney fees, other than through chapter 13 plan installments.[7]

## *Brown's Plan*

Brown's plan was very similar to that proposed by Jackson. Over a term of three years, the plan proposed to pay attorney fees, filing fees, the trustee's commission, and approximately 16% of scheduled claims of unsecured creditors.[8] There were no priority or secured claims to be paid, and according to his schedules, all of Brown's assets are protected by his allowed exemptions. Brown's plan proposed to pay all administrative expenses, including attorney fees, in full before any distribution to creditors.[9] Accordingly, before the first dollar is paid to

---

[7] The Court's comments should not be interpreted as criticizing counsel for her failure to ask for a continuance. The purpose behind Jackson's and his counsel's choice between chapters 7 and 13 was obvious, and a delay to further verify the obvious would have been a waste of time.

[8] The claims bar date in Brown's case has expired, and three creditors filed claims, in the respective amounts of $501.50, 489.46 and $364.12. Brown's plan proposed to pay attorney fees of $2,000; thus counsel's administrative claim for her fees, as in Jackson's case, will be the largest allowed claim in the case.
As mentioned, these two cases are very similar; neither is complex and each should have consumed approximately the same amount of counsel's time and required the same amount of professional skill and knowledge. The same law firm represented both Debtors. Nonetheless, as mentioned in note 4, *supra*, the initial attorney fee proposed in Jackson's case was $2,500, which was later reduced to $1,500; however, the fee proposed in Brown's case has always been $2,000.

[9] As discussed in note 13, *infra*, such a provision was initially proposed in Jackson's plan but later dropped.

4

creditors, payments during the first 16 months of Brown's 36-month plan will be exclusively devoted to paying attorney fees, filing fees and trustee's commission.

At the hearing, Brown's counsel candidly admitted the only reason Brown filed for relief under chapter 13 was to finance his attorney fees because he could not come up with the funds needed to prepay fees for a chapter 7 case. Brown was present at the hearing and confirmed counsel's admission as to why chapter 13 was chosen over chapter 7.[10]

### Good Faith – Duty of Bankruptcy Court

A chapter 13 plan may be confirmed only if a bankruptcy court finds the petition was filed, and the plan was proposed, in good faith. §§ 1325(a)(3), (7). And even in the absence of objections by creditors or a trustee, a bankruptcy court has an independent duty to determine that all prerequisites for plan confirmation have been satisfied.[11] A chapter 13 debtor has the burden of proof to establish each element required for confirmation, including establishing both that the case was filed and that the plan was proposed in good faith.[12]

As with all prerequisites for chapter 13 plan confirmation, the Eleventh Circuit

---

[10] Yet another benefit to filing chapter 7 is that both Brown and Jackson appear to qualify for an *in forma pauperis* waiver of the chapter 7 filing fee under the current guidelines. No such waiver is available for chapter 13.

[11] *United Student Aid Funds, Inc. v. Espinosa*, 130 S. Ct. 1367, 1381 n. 14 (2010) (bankruptcy courts required to address defects in proposed plans even if no creditor raises the issue); *Alabama Dept. Of Economic & Community Affairs v. Ball Healthcare-Dallas, LLC (In re Lett)*, 632 F.3d 1216, 1228-30 (11th Cir. 2011) (bankruptcy courts have independent obligation to determine if absolute priority rule was violated); *Universal American Mortgage Co. v. Bateman (In re Bateman)*, 331 F.3d 821, 828 n. 6 (11th Cir. 2003) (bankruptcy courts have independent obligation to ensure compliance with the Code).

[12] *See e.g., In re Lavilla*, 425 B.R. 572 (Bankr. E.D. Cal. 2010) (discussing the distinction between a finding of "bad faith" and a finding of "not in good faith", and also discussing the burden of proof for confirmation).

has directed bankruptcy courts to take an active role in assessing good faith:

> We hold that with Section 1325(a)(3) Congress intended to provide bankruptcy courts with a discretionary means to preserve the bankruptcy process for its intended purpose. Accordingly, whenever a Chapter 13 petition appears to be tainted with a questionable purpose, it is incumbent upon the bankruptcy courts to examine and question the debtor's motives. . . . We simply require that the bankruptcy courts preserve the integrity of the bankruptcy process by refusing to condone its abuse.

*Shell Oil v. Waldron (In re Waldron)*, 785 F.2d 936, 941 (11th Cir. 1986).  *See also Jim Walter Homes v. Saylors (In re Saylors)*, 869 F.2d 1434, 1438 (11th Cir. 1989) (bankruptcy court is in the best position to evaluate good faith and weigh *Kitchens* factors, *infra*, as it sits as finder of fact and can best assess debtor's credibility).  And the Eleventh Circuit is not the only circuit that recognizes the importance of bankruptcy court scrutiny of chapter 13 plans to determine if good faith standards are satisfied and to require that confirmation of abusive plans be denied:

> The good faith requirement demands a separate, independent determination. As indicated, in determining whether a debtor's plan meets the section 1325(a)(3) confirmation requirement of good faith, we believe the proper inquiry should follow the analysis adopted by the Fourth Circuit: whether the plan constitutes an abuse of the provisions, purpose or spirit of Chapter 13. The bankruptcy court must utilize its fact-finding expertise and judge each case on its own facts after considering all the circumstances of the case. *If, after weighing all the facts and circumstances, the plan is determined to constitute an abuse of the provisions, purpose or spirit of Chapter 13, confirmation must be denied.*

*United States v. Estus (In re Eutus)*, 695 F. 2d 311, 316 (8th Cir. 1982) (emphasis added); *See also In re LeMaire*, 898 F.2d 1346, 1351 (8th Cir. 1990) (holding, after addition of disposable income test, that the totality of the circumstances must still be examined in assessing good faith to determine if the plan "constitutes an abuse of the provisions, purpose, or spirit of Chapter 13", with particular emphasis given to the debtor's motivation and sincerity in seeking chapter 13 relief (quoting *Eustus*, 695 F.2d at 316)).

6

*Purpose of Chapter 13*

It is important to recognize, in the simplest terms, the function chapter 13 serves in the context of debt relief for individuals, especially as compared with chapter 7. According to the Eleventh Circuit:

> "Chapter 13 is designed to facilitate adjustments of the debts of individuals with regular income through extension and composition plans funded out of future income, under the protection of the court." 5 *Collier on Bankruptcy* ¶ 1300.02 (15th Ed. 1982). A chapter 13 plan allows a debtor to preserve his existing assets, while creditors benefit from ratable recovery out of the debtor's future income, which is unavailable in a chapter 7 liquidation.

*Kitchens v. Georgia Railroad Bank & Trust Co. (In re Kitchens),* 702 F.2d 885, 887 (11th Cir. 1983). Similarly, Congress expressed its views of why an individual would seek relief under chapter 13 as opposed to chapter 7:

> The purpose of chapter 13 is to enable an individual, under court supervision and protection, to develop and perform under a plan for the repayment of his debts over an extended period. In some cases, the plan will call for full repayment. In others, it may offer creditors a percentage of their claims in full settlement . . . . The benefit to the debtor of developing a plan of repayment under chapter 13, rather than opting for liquidation under chapter 7, is that it permits the debtor to protect his assets. In a liquidation case, the debtor must surrender his nonexempt assets for liquidation and sale by the trustee. Under chapter 13, the debtor may retain his property by agreeing to repay his creditors.

H.R.Rep. No. 95-595, at 1 (1977), U.S. Code Cong. & Admin. News 1978, p. 5863; *see also In re Levine*, 10 B.R. 168, 169 (Bankr. D. Mass 1981) (denying confirmation of plan offering 10% dividend to unsecured creditors and holding that "Chapter 13 was intended by Congress to provide certain benefits to debtors which are unavailable under either Chapter 11 or Chapter 7"). Thus, the precept for chapter 13 relief is adjustment of an individual's debts by way of developing a plan for their repayment, while preserving assets that otherwise might be liquidated under chapter 7. In the Debtors' cases, there is no meaningful adjustment of their debts and none

Case 11-42825-JJR13   Doc 32   Filed 03/16/12   Entered 03/16/12 12:47:11   Desc Main
Document     Page 7 of 21

of their assets are being protected – they are all exempt. It is axiomatic that a chapter 13 case filed for the wrong purpose is not filed in good faith.

<u>*Analysis of Debtors' Plans Vis-a-Vis Attorney Fees*</u>

As a point of beginning to determine whether the Debtors' plans should be confirmed, including a finding that they do not constitute an abuse of the provisions, purpose or spirit of chapter 13, the Court will first express its unequivocal agreement with the established and broadly accepted view of other courts who have found chapter 13 was designed by Congress for the "Adjustment of Debts of Individuals With Regular Income" – the official title given to chapter 13 in the Bankruptcy Code – and it was not intended as a payment collection and enhancement device for attorneys. *In re Buck*, 432 B.R. 13 (Bankr. D. Mass. 2010) (condemning the use of chapter 13 as an attorney fee collection service in cases where debtors were excellent candidates for chapter 7 relief, and when chapter 7 would be in their best interest, although they were unable to prepay chapter 7 attorney fees up front); *In re Puffer*, 453 B.R. 14, 19-20 (D. Mass. 2011) (discussing *In re Buck*, which collects cases on the subject, and emphasizing that the majority of courts to consider the issue find chapter 13 cases filed in lieu of otherwise-available chapter 7 relief to finance attorney fees, which the debtor cannot afford to prepay, are not filed in good faith under §§ 1325(a)(3), (7)). As discussed by the district court in *Puffer*, such a tactic is not redeemed by the fact that through chapter 13, the debtor may be provided legal services that might ultimately result in a discharge where such a "stratagem of invoking chapter 13 [serves to] delay by *years* such discharge, much to [debtor's] detriment." *Id.* at 19 (emphasis in original).

The majority of reported cases hold that "Chapter 13 plans in which all or virtually all of the funds to be distributed are paid only to [d]ebtors' counsel unquestionably fail to meet any fair

8

interpretation of the term 'good faith' in §§ 1325(a)(3) and (7), respectively." *In re Buck*, 432

B.R. at 22. The court in *Buck* summarized the reported case law on this issue:

> The overwhelming majority of courts that have addressed this question agree that Attorney Fee–Only Chapter 13 Plans fail to meet the good faith requirement of § 1325(a)(3). However, the plans in some of those cases also failed to meet good faith requirements on additional grounds. *See In re Sanchez,* No. 13–09–10955 MA, 2009 WL 2913224, at *1, *3 (Bankr.D.N.M. May 19, 2009) (finding a lack of good faith with a plan that pays only attorneys' fees in a case where debtors have a history of incurring "debts they are unable to repay and then seek[ing] bankruptcy protection every few years in order to alleviate their debt burden"); *In re Lehnert,* No. 07–55988, 2009 WL 1163401, at *4 (Bankr.E.D.Mich. Jan.14, 2009) (sustaining an objection to an Attorney Fee—Only Plan as not filed in good faith because the debtors were able to afford some dividend to creditors); *In re Montry,* 393 B.R. 695, 696–97 (Bankr.W.D.Mo.2008) (stating "[c]onfirming a Chapter 13 plan in a case where the only benefit to a debtor—beyond the relief available in Chapter 7—is the ability to pay the bankruptcy attorney fees over time would ... unnecessarily raise the cost of filing a bankruptcy petition for debtors who do not need or are ill suited for Chapter 13; and subvert the Supreme Court's holding in *Lamie v. U.S. Trustee* prohibiting the payment of post-petition attorney's fees from a debtor's Chapter 7 bankruptcy estate.") (footnotes omitted); *In re Paley,* 390 B.R. 53, 59–60 (Bankr.N.D.N.Y.2008) (stating "[t]he Debtors are not adjusting anything, much less debt; they are canceling and eliminating the claims of creditors while simply paying their attorneys. Under the theories advanced by the Debtors, carried to an absurd extreme, if they had paid their respective attorneys in full up front, they would have proposed a plan of $0 for zero months and demanded a Chapter 13 discharge.... These cases, basically Chapter 7 cases hidden within Chapter 13 petitions, blur the distinction between the chapters into a meaningless haze."); *In re Dicey,* 312 B.R. 456, 459–60 (Bankr.D.N.H.2004) (stating "[n]ot only is the Plan a thinly disguised liquidation, but it is in essence only a payment plan for the Debtors' bankruptcy attorney's fees. Congress did not create Chapter 13 as a vehicle solely for the payment of attorney's fees."). *But see In re Molina,* 420 B.R. 825, 830–33 (Bankr.D.N.M.2009) (holding that a debtor who is in "economic straits;" "literally doing all that the statute requires of her;" ineligible to file for Chapter 7; and compliant with "the letter, and the spirit, of the chapter 13 law as Congress has written it" may file an Attorney Fee–Only Chapter 13 Plan).

*Id* at 22, n. 14.

This Court further agrees with the finding in *Buck* that the term "fee only case" should also

include cases that provided some small distribution to unsecured creditors, where the "main

9

purpose" for choosing chapter 13 as opposed to chapter 7 was to finance attorney fees. *Id*. at 18, n.7.[13]

In its analysis of a plan similar to those proposed by the Debtors in the instant cases, the District Court for the District of Massachusetts affirmed a bankruptcy court's decision that found good faith was lacking in an attorney-fee-centric chapter 13 case although the plan proposed a small dividend to creditors. The district court further found that the overwhelming majority of reported cases addressing such cases held they were an abuse of chapter 13:

> Appellant contends that the bankruptcy court erred when it followed the majority of courts nationwide in finding that attorney fee-only Chapter 13 plans lack the good faith required by § 1325(a)(3). Upon *de novo* review of the bankruptcy court's rulings of law, this court is unpersuaded by Appellant's arguments both as they pertain to Debtor's case specifically, and to the landscape of bankruptcy law generally. *See In re LaRoche,* 969 F.2d 1299, 1301 (1st Cir.1992). While sympathetic to Appellant's quandary —how to provide necessary representation to clients who are unable to pay for his services—the court can ignore neither the sound rulings from bankruptcy courts nationwide nor the facts of Debtor's case here.
>
> The discussion must begin with the observation that Appellant could identify only one bankruptcy court that has upheld attorney fee-only Chapter 13 plans. *See In re Elkins,* No. 09–09254–8–JRL, 2010 WL 1490585, at *2, 2010 Bankr.LEXIS 1085, at *4 (Bankr.E.D.N.C. Apr. 13, 2010) (noting a "tidal wave" of attorney fee-only cases). *But see In re Arlen,* No. 10–21980–DRD–13, 2011 WL 1667473, at *3, 2011 Bankr.LEXIS 1638, at *10 (Bankr.W.D.Mo., May 3, 2011) ("These cases are little more than disguised Chapter 7 proceedings. Utilizing Chapter 13 in this fashion blurs the distinctions between the two chapters and the various

---

[13] In an attempt to divert attention away from plans whose primary purpose is to pay attorney fees, rather than adjust debts and preserve a debtor's property, a small dividend is often proposed to unsecured creditors. What is telling are provisions in such plans that delay the commencement of payments to unsecured creditors until after attorney fees are fully paid. Such a provision has always been present in the Brown case. The original plan proposed in the Jackson case called for attorney fees to be fully paid before any payment to creditors; however, that proposal was later abandoned and is absent from the plan now under consideration. But such a simple change does not cure the problem or hide the fact that the Debtor's financial woes are best addressed through chapter 7 and his plan "constitute[s] an abuse of the provisions, purpose [and] spirit of Chapter 13." *Estus,* 695 F. 2d at 316.
.

differences in their scope and purpose as reflected by the different applicable statutory provisions."); *In re Paley,* 390 B.R. 53, 59 (Bankr.N.D.N.Y.2008) ("A plan whose duration is tied only to payment of attorney's fees simply is an abuse of the provisions, purpose, and spirit of the Bankruptcy Code."); *In re Dicey,* 312 B.R. 456, 460 (Bankr.D.N.H.2004) ( "Congress did not create Chapter 13 as a vehicle solely for the payment of attorney's fees."); *In re Levine,* 10 B.R. 168, 169 (Bankr.D.Mass.1981) (observing that the "majority of bankruptcy cases that have quantifiedly interpreted the 'good faith' requirement of § 1325(a)(3) have concluded that there must be a meaningful or substantial payment under the plan" and listing cases).

*In re Puffer*, 453 B.R. 14, 19-20 (D. Mass. 2011) (emphasis added).

To the uninitiated it might appear that at least the Debtors in these cases may eventually receive a discharge of their debts if they complete their plans, although it will take years in chapter 13 rather than a few months through chapter 7. Such a naïve position ignores the abysmal failure rate of chapter 13 cases. In the Eastern Division of this District (and probably District- and nation-wide), approximately 65% of all chapter 13 cases fail before debtors complete their plans and become eligible for a discharge. And for these two cases in particular, the Debtors have little incentive to stay the course for three years. They are not saving their homes by paying mortgage arrears or protecting non-exempt equity or assets; neither are they avoiding repossession of vehicles, nor holding at bay tax or domestic support creditors. If either of the Debtors defaults, his case will be dismissed, and he may simply file another chapter 13 petition and start over again – including another round of plan installments to pay attorney fees. The Court has seen this scenario repeated *ad nauseum*; it captures debtors who are promised a quick fix, but never achieve a discharge; their serial chapter 13 filings benefiting no one except their attorneys, who may receive payments over the course of these unsuccessful cases in what may be tantamount to an annuity.[14] Another alternative for the Debtors might be to convert their

_____

[14] The court in *In re Buck*, spoke bluntly about the dubious role of debtor's counsel in that case:

11

cases to chapter 7 after they have accumulated sufficient funds to pay attorney fees or have paid them through early plan payments as proposed by Brown's plan and originally proposed in Jackson's; however, there is no good faith to be found in a temporary chapter 13 case filed to accommodate payment of attorney fees as a prelude to a conversion to chapter 7.

As previously discussed, for these Debtors, and many like them, the benefits of chapter 7 relief are palpable, and under their circumstances, far outweigh those available through chapter 13. So why did the Debtors not pay their attorneys to file a chapter 7 case? There are three possibilities, and all are troubling. The first possibility is they were not informed they qualified for chapter 7 relief, and made aware of the differences between the two chapters. The second and third possibilities are they either lack the financial wherewithal, or lack the discipline to

> But while this Court does not minimize the struggle of many Chapter 7 debtors to retain counsel, the Attorney Fee-Only Chapter 13 Plan here doubled the Debtors' attorneys' fees while increasing the risk they would fail to receive a discharge at all. In this way, [debtor's attorney] has not used Chapter 13 as a payment device; rather, he has used Chapter 13 as a payment collection and enhancement device. At some point, one has to wonder whether the line between client assistance and client exploitation has been blurred and whether [debtor's attorney]'s form Retainer Agreement in these and other respects could be more properly characterized as adhesion contracts.

432 B.R. at 22, n. 15.

And the chapter 13 trustee in *Buck* was similarly critical:

> First, [the Chapter 13 Trustee] argues that such plans are merely thinly veiled Chapter 7 cases, thereby contravening the fundamental purpose of Chapter 13 – to permit a debtor to repay his or her debts over an extended period of time through future income. Second, the Chapter 13 trustee highlights the retainer agreements docketed in these cases. She argues that these agreements place debtors into involuntary servitude – forced to pay off their attorneys' fees and denied a discharge in the meantime. Finally, the Chapter 13 trustee argues that Attorney Fee-Only Chapter 13 Plans fail to meet the good faith requirements of § 1325(a).

*Id.* at 19.

12

accumulate the funds necessary to pay the chapter 7 attorney fees – fees that are usually substantially less than those customarily charged for chapter 13.[15] If counsel adequately explained the differences between the two chapters, and the Court will assume as much, they and the Debtors must have reached the inescapable conclusion that chapter 7 provided the better relief given the Debtors' circumstances, except for no accommodation allowing payment of attorney fees over time. Thus, the Court infers the Debtors lack either the financial means or the discipline, or perhaps lack both, needed to come up with the fees. Regardless of whether it is the lack of means or discipline, both are harbingers for imminent default and dismissal. How can these Debtors be expected to budget their money and exercise the self-control needed to stay the course for the three years required to satisfy a chapter 13 commitment, when they cannot make a one-time payment to their attorneys for the chapter 7 relief they so desperately need? The simple answer is that in chapter 13, they are being set up for failure and exposed to the risk of being caught up in the chapter 13 revolving door.[16]

In *In re Nelson*, 2009 WL 2241567 (Bankr. M.D. Ala. 2009), the debtor's plan dealt with two secured creditors (a long-term mortgage creditor to be paid directly with no prepetition

---

[15] Attorneys in this Division often charge $1,000 or less to file a simple chapter 7 case.

[16] Chapter 13 has allowed untold numbers of financially distressed individuals to avoid foreclosure of homes and repossession of vehicles needed to get to work, and to protect non-exempt assets from judgment creditors; but there is a dark side to chapter 13. For too many debtors chapter 13 becomes a relief valve that can be turned on and off as needed when creditors become too aggressive. Instead of paying out a plan and obtaining a discharge, debtors often incur additional debts while their cases are pending. Their cases are dismissed, followed by another chapter 13 petition for relief. The much-acclaimed financial fresh start is never achieved and frankly is not on their agenda. This judge has seen debtors who have filed numerous chapter 13 cases that span decades. For serial debtors, chapter 13 encourages irresponsible credit decisions and a tumultuous financial lifestyle, and often becomes a government-sponsored program on which they rely as a means of quasi-support – a means by which they can repeatedly incur debt without repayment.

13

arrears and a furniture creditor owed $262 to be paid through the plan), only one of which would be discharged in the case. *Id.* at *1. The debtor had below-median income and pursuant to § 1322(d) his applicable commitment period was 36 months but he proposed a 40-month plan that would repay approximately 4.65% of unsecured claims (a pro rata share of $1,000). *Id.* The attorney fee in the case was, for that District, the "no-look" fee of $2,500. *Id.* Judge Williams pointed out that once the attorney fee and small secured claim were paid, the debtor would have a strong incentive to convert to chapter 7, because conversion would allow an immediate discharge without further payments to unsecured creditors. *Id.* at *2. Such a conversion (as well as a dismissal prior to completion) would place a burden on the chapter 13 trustee, as plans that are completed subsidize plans that are dismissed or converted, with much of the trustee's costs of administration incurred early in a case. *Id.*

In most chapter 13 cases, paying attorney fees through a plan is not only permitted, it is the norm. However, when payment of such fees becomes the overriding purpose for filing a chapter 13 case, especially when relief under chapter 7 would be the logical choice if it were not for the attorney-fee hurdle, then such a case and its accompanying plan abuse the provisions, purpose and spirit of chapter 13.

### *Eleventh Circuit's Kitchens Factors*

Putting payment of attorney fees aside, the Debtors' cases and plans raise additional good faith issues. To begin with, in determining whether a chapter 13 case was filed and its plan proposed in good faith, a bankruptcy court within the Eleventh Circuit should take into account the good-faith factors prescribed in *Kitchens, supra.* The circuit court stated that good faith could not be simply measured by doing the arithmetic to confirm compliance with the "best interest test" under § 1325(a)(4). *Kitchens,* 702 F.2d at 888. Rather, a bankruptcy court must

14

consider, but is not limited to, the following factors to determine good faith:

> (1) the amount of the debtor's income from all sources; (2) the living expenses of the debtor and his dependents; (3) the amount of attorney's fees; (4) the probable or expected duration of the debtor's Chapter 13 plan; (5) the motivations of the debtor and his sincerity in seeking relief under the provisions of Chapter 13; (6) the debtor's degree of effort; (7) the debtor's ability to earn and likelihood of fluctuation in his earnings; (8) special circumstances such as inordinate medical expense; (9) the frequency with which the debtor has sought relief under [the Bankruptcy Code]; (10) the circumstances under which the debtor has contracted his debts and his demonstrated bona fides, or lack of same, in dealing with his creditors; [and] (11) the burden which the plan's administration would place on the trustee.

*Id*. at 888-89.

As mentioned, the above good-faith factors are not exhaustive, and among others the *Kitchens* court suggested for consideration are the substantiality of repayment to the unsecured creditors, whether debts would be nondischargeable under chapter 7, and inaccuracies in a debtor's schedules. *Id*. at 889. (*See also In re Nelson*, *supra*, citing *Kitchens*, 702 F.2d at 889). Of utmost concern, as discussed at length above, were the Debtors' motivations and sincerity that were tainted because they sought relief under chapter 13, not to adjust debts and preserve assets, but to accommodate payment of attorney fees. In addition, this Court cannot ignore two other *Kitchens* factors: the burden which administration of the Debtors' plans will place on the trustee, and as a segue to discuss exceptional circumstances recognized by *Kitchens*, the substantiality of the proposed repayment to unsecured creditors.

It is inconceivable that the trustee's commission in these cases will pay more than a fraction of her expenses and overhead related to servicing the Debtors' plans and paying minuscule distributions to creditors. At first glance, it may appear the Debtors should be permitted to proceed under chapter 13 because their plans at least propose to pay small, albeit

Case 11-42825-JJR13    Doc 32    Filed 03/16/12    Entered 03/16/12 12:47:11    Desc Main
Document      Page 15 of 21

tenuous distributions to unsecured creditors – something being better than nothing.[17]  However, as mentioned above in notes 5 and 8, the realities are that few creditors bothered to file claims perhaps because the likelihood of any meaningful payments was not feasible under the Debtors' budgets,[18] and distributions from the trustee will be of little consequence.  Creditors' expenses and those that will be incurred by the trustee, will, in most instances, exceed the recovery and commission.  And let us not forget that the primary job of the trustee in these two cases will be to collect and distribute plan payments to pay attorney fees.

The bankruptcy court in *In re Nelson*, *supra*, found that even if a plan that was similar to those proposed by the Debtors in these cases were completed, it would be burdensome to unsecured creditors who would receive monthly checks in minimal amounts for the duration of the case.  *Id.* Against that background, the court found the case was not proposed in good faith "because it is chiefly a means of financing the debtor's attorney fee without offering either the debtor or his creditors any meaningful benefit over what they would receive in a hypothetical chapter 7 case," *id.*, and sustained the trustee's objection to confirmation.[19] *See also In re Buck*, 432 B.R. 13, 17 (Bankr. D. Mass. 2010) (court sustained trustee's objection on grounds "that from 'an economic and legal standpoint, it does not appear to be in the Debtors' best interest to be in Chapter 13'").

---

[17] If a debtor should feel a moral obligation or otherwise wish to pay his creditors after receiving a chapter 7 discharge, § 524(f) expressly allows him to do just that.

[18] See Debtors' Schedules I and J.

[19] The Court is mindful that the real cost of administering chapter 7 cases disguised as chapter 13's is born by legitimate chapter 13 debtors, whose trustee's commissions are being used to subsidize the abuse by debtors such as the Debtors in these cases.  Even when a trustee's operations are indisputability efficient, such as those in this Division, the Court cannot condone such cost-shifting, regardless of the temptation to give a desperate debtor relief under chapter 13.

16

In its *Kitchens* decision, the Eleventh Circuit mentioned substantiality of the repayment of unsecured creditors as a factor that may be considered when good faith is an issue in a chapter 13 case, but it specifically noted "that other factors or exceptional circumstances may support a finding of good faith, even though a debtor has proposed no or only nominal repayment to unsecured creditors."  702 F.2d at 889 (citing *In re Eutus,* 695 F.2d at 317).  As an illustration, the court approved of the exceptional circumstances found in *Matter of Bellgraph*, 4 B.R. 421 (Bankr. W.D.N.Y. 1980).  In *Bellgraph*, the chapter 13 debtor was a totally disabled 56-year-old mother of seven, whose plan proposed to pay off taxes and secured creditors, or allow them to maintain their security, thus allowing her family to save their home.  Filing chapter 13 to cure defaults in home mortgages – sanctioned by § 1322(b)(5) – is a widespread utilization of chapter 13, even in cases where nominal or no payments are proposed for unsecured creditors.  Recall, however, that the Debtors in these cases have no home mortgages or other secured debts, they have no priority tax or domestic support obligations, and neither has non-exempt assets to protect.  It would be dubious at best to argue that the inability or unwillingness to pay attorney fees on a pre-petition basis is an exceptional circumstance that would be sanctioned by the Eleventh Circuit as a legitimate purpose for seeking chapter 13 relief when a debtor is otherwise ill-suited for chapter 13, and all legitimate considerations point to chapter 7 as the only sensible choice.

Two other *Kitchens* factors should also be discussed with regard to Jackson's case and plan.  Recall that Jackson's largest scheduled creditor is the Department of Education/Sallie Mae, to whom Jackson is indebted for a substantial education loan.  Because of the exception from discharge of education loans under § 523(a)(8), even if Jackson were to successfully complete his plan, his education loan will not be discharged.  Sallie Mae did not file a claim,

17

timely or otherwise, and Jackson did not file a claim on its behalf as permitted by Code § 501(b) and Rule 3004 of the Federal Rules of Bankruptcy Procedure. Thus, during the plan's three year term, all Jackson will have accomplished with respect to Sallie Mae's claim is to postpone the imminent day of reckoning for payment of that debt, not to mention the accrual of additional interest, expenses and penalties. A chapter 7 case would quickly conclude with a discharge of all debts other than the education loan, and free up Jackson's finances so he could devote post-discharge income to pay Sallie Mae. Without question, both Jackson and his § 523(a)(8) creditor – Sallie Mae – would be better served through chapter 7. To conclude otherwise is not only myopic, it further demonstrates that the payment of attorney fees in this case has been elevated above Jackson's best interest.

Finally, it has become evident that Jackson's schedules are not accurate. As mentioned in note 5, *supra*, only one creditor listed in his schedules filed a proof of claim, and that was filed after the bar date. Jackson filed no claims on the behalf of any creditor, most notably Sallie Mae. However, three creditors did file timely claims; creditors who cannot be found on the schedules. Jackson has not objected to the claims filed by these unscheduled creditors, and absent objections their claims are deemed allowed. § 502(a). One has to wonder how many additional creditors were omitted from the schedules but failed to receive notice through other means. Omitting creditors from schedules usually means they are not notified of the case and lose their opportunity to file claims and participate in the plan. Of importance from a debtor's perspective, is the risk that claims of omitted creditors who do not otherwise get timely notice will not be discharged even if a debtor were to complete his plan. § 1328(a) (only debts "provided for by the plan" are discharged). Could it be that for Jackson, accurately listing creditors and anticipating a discharge were not major concerns when schedules were being prepared? Perhaps the concern

18

was more focused on how to get his lawyer paid. Regardless, the schedules are inaccurate, at least with respect to the three unscheduled creditors who filed timely claims.[20]

*Conclusion*

In these cases, the Debtors' best interests are served by seeking relief in chapter 7, not chapter 13, and the Court finds that they would have done just that if payment of attorney fees were not an obstacle. A chapter 7 case will enable the Debtors to receive discharges in short order; they will be protected in the meantime by the automatic stay; they will not be burdened with plan payments for three years, which for these Debtors may be insurmountable tasks; and perhaps most significantly, they will not run the high risk of default and dismissal of their cases followed by repeat performances. These Debtors, and others whose circumstances beg for chapter 7 relief, but nonetheless are motivated by an opportunity to pay their attorney fees on the installment plan, cannot simply disguise their opaque chapter 7 cases by cloaking them in illusory chapter 13 petitions. If allowed, these misguided debtors impermissibly burden chapter 13 trustees and bankruptcy courts with the administration of their cases which are subsidized by debtors in "legitimate" chapter 13 cases. And more times than not, they are wasting their own time and money for a short-lived financial respite rather than receiving a discharge and the

---

[20] No amended schedules were filed. A $30.00 fee is charged to amend schedules and add omitted creditors. Bankruptcy Court Miscellaneous Fee Schedule (4), issued in accordance with 28 U.S.C. § 1930(b).

While omitting three creditors (and possibly more) from schedules is a serious deficiency, absent the other problems with confirmation that were discussed herein, or unless the omissions were shown to be intentional, they probably would not be grounds to deny plan confirmation. As mentioned in note 6, *supra*, the educational loan owing to Sallie Mae was mislabeled in the schedules as a "credit card debt." The omitted creditors and mislabeling of Sallie Mae's debt leaves the Court with the impression that little care was given to the preparation of Jackson's schedules.

19

financial fresh start they need and for which they are qualified.

There is simply no meaningful or legitimate debt adjustment purpose to be found in the Debtors' cases or plans.  Rather, the thinly veiled purpose for both was to pay attorney fees on the installment plan, not to protect encumbered property from secured creditors or non-exempt assets from liquidation by a trustee.  Perhaps most glaring is that even if their proposed chapter 13 plans are ultimately paid, everything that might be accomplished over the next three years can be achieved more quickly and cheaply, and with greater certainty – especially a discharge – under chapter 7.  Hence, the provisions, purpose and spirit of chapter 13 are being abused, and the Court finds that the Debtors' cases were not filed, and their plans were not proposed, in good faith as required by §§ 1325(a)(3) and (7).[21]

---

[21] Years ago when the stigma of bankruptcy was much greater, cases like these were a rare phenomenon, but with the proliferation of liberal credit card offerings, check-advance and pay-day lenders, and rent-to-own vendors, the filing of fee-driven cases has evolved into a virtual institution, at least in the Eastern Division of this District.  All participants, except the debtors, reap some benefit.  The benefit to attorneys – payment of their fees in each successive case – has been discussed at length in this opinion.  Creditors benefit when their claims are rarely discharged because most of these cases are dismissed before the plan is fully paid, and in the meantime miniscule dividends might be paid.  Creditors can collect their claims after cases are dismissed and before serial debtors file another petition.  The check-advance and pay-day lenders, and rent-to-own vendors – creditors-of-last-resort – often extend additional credit with exorbitant interest and fees to debtors who are in active chapter 13 cases.  Once the debt-load from the additional credit, when added to the chapter 13 payments, becomes too great, the case is dismissed after a lengthy dismissal process, and the cycle starts over. The courts, including this one, and trustees are not immune from criticism.  Reporting a high number of active chapter 13 cases may allow them to glow in statistical glory, which to the uninformed leaves the impression of hard work for a worthy cause.  But what are we really accomplishing by allowing such a misguided utilization of chapter 13?  Remember these are debtors whose incomes are below the median even for Alabama – a state near the bottom of the national average – and are not those targeted by Congress when it adopted BAPCPA. As the trustee in *Buck* so bluntly and aptly said: "these agreements placed debtors into involuntary servitude – forced to pay off their attorneys fees and denied a discharge in the meantime." 432 B.R. at 19.

An interesting, albeit disturbing article recently appeared on the front page of the *New York Times,* in which deficiencies in the chapter 13 system were discussed, primarily from a

*Order*

Accordingly, it is hereby ORDRED that confirmation of the Debtors' respective plans (Jackson Doc. 30; Brown Doc. 5) is DENIED, and each of the Debtors shall have 14 days to convert his case to a case under chapter 7. If either case is not timely converted it will be dismissed.

So Ordered: March 16, 2012

/s/ James J. Robinson
JAMES J. ROBINSON
United States Bankruptcy Judge

---

racial disparity viewpoint. Nonetheless, several observations transcend race:

> The vast majority of debtors file under Chapter 7 . . ., which typically allows them to erase most debts in a matter of months. It tends to have a higher success rate and is less expensive than the alternative, Chapter 13, which requires debtors to dedicate their disposable income to paying back their debts for several years.
> . . . .
> If a debtor chooses an inappropriate chapter, there can be serious implications. Chapter 13 plans, for instance, are more likely to fail than a Chapter 7. Nearly two of every three Chapter 13 plans are not completed, which means the filers' remaining debts are not discharged, leaving them right where they started. One bankruptcy judge, who sees filers once they can no longer make the required payments in the plans, said the debtors usually do not have enough income to stick with the budget.
> . . . .
> Even though the attorneys' fees for the more labor-intensive Chapter 13 are more than double the charge for Chapter 7, some truly distressed debtors will pursue a Chapter 13 anyway, several bankruptcy experts said. That is because they can pay the fee over time, unlike in a Chapter 7, which typically requires a payment before the case is filed. . . .
> . . . .
> . . . "We should focus not on picking apart the conclusions," Mr. [Henry E.] Hildebrand [III] said, "but use this study as an indication that we should be attempting to fix what has become a complex, expensive, unproductive system."

Bernard, *Blacks Face Bias in Bankruptcy, Study Suggests*, N. Y. Times, January 20, 2012, at 1, col. 1.

21